**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JAMES WHITEHEAD,
and AUBREY DUNN,

     Plaintiffs,

     vs.                                    Civ. No. 20-491 JAP/LF

TRISTANNA BICKFORD, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

On April 17, 2020, Plaintiffs James Whitehead and Aubrey Dunn filed an AMENDED COMPLAINT TO RECOVER DAMAGES DUE TO DEPRIVATION OF CIVIL RIGHTS VIOLATIONS OF THE UNITED STATES AND NEW MEXICO CONSTITUTIONS AND FOR VIOLATIONS OF THE NEW MEXICO INSPECTION OF PUBLIC RECORDS ACT ("FAC") (Doc. 1, Attach. 1 at 40–46).  Relevant here, Plaintiffs seek redress for purported violations of their First Amendment rights under 48 U.S.C. § 1983.  On May 21, 2020, Defendants Tristanna Bickford, Jennifer Montoya, and Michael Sloane (collectively "Defendants") removed from the Seventh Judicial District Court, *see* NOTICE OF REMOVAL ("Notice") (Doc. 1), and filed a PARTIAL MOTION TO DISMISS AMENDED COMPLAINT ("Motion") (Doc. 3).[1]  Defendants move to dismiss Count I (First Amendment Retaliation) of the FAC.  After careful consideration of the pertinent law and the parties' briefing, the Court will grant the Motion.

---

[1] The Motion is fully briefed.  *See* RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, ("Response") (Doc. 12); REPLY BRIEF IN SUPPORT OF THE MOTION TO DISMISS, ("Reply") (Doc. 14).

# I.  FACTUAL BACKGROUND[2]

Plaintiff Whitehead obtained the addresses of all successful Big Game hunt applicants for the years 2015 through April 23, 2019, via an "Inspection of Public Records Act" ("IPRA") action brought against the New Mexico Department of Game and Fish ("NMDGF").  FAC at ¶ 8; *see* STIPULATED ORDER ON SUMMARY JUDGMENT (Doc. 1, Attach. 1 at 13).  Plaintiff Dunn obtained the names and addresses of all hunting license applicants for the years 2015 through 2016 through an IPRA lawsuit brought against the NMDGF.  *Id*. at ¶ 9; *see Dunn v. New Mexico Dep't of Game & Fish*, 2020-NMCA-026, ¶ 1, 464 P.3d 129, 130, (Doc. 1, Attach 1 at 15–28).  On March 19, 2020, after providing the records to Plaintiff Whitehead but before furnishing them to Plaintiff Dunn, Defendants disseminated an email press release to over 300,000 New Mexico hunters that notified them of the court ordered IPRA disclosures to Plaintiffs.  FAC at ¶ 10.  Plaintiffs faced immediate scrutiny and harassment on social media platforms following the email.  *Id*. at ¶ 11. Plaintiffs allege that Defendants notified the hunters in order to retaliate against Plaintiffs for "their exercise of their First Amendment right to petition their government for redress of grievances." *Id*. at ¶ 12.

Plaintiffs further allege that, during the underlying lawsuits, Defendant Montoya complied with other IPRA requests without Defendants Bickford and Sloane issuing a press release that notified the public of the disclosure.  *Id*. at ¶ 13.  In addition, Plaintiffs allege that after the NMDGF issued the press release at issue, they made additional IPRA requests that Defendants failed to comply with in form and substance.  *Id*. at ¶¶ 14, 15.  Specifically, Plaintiffs allege that the

---

[2] The Court accepts as true the factual allegations in the Complaint for the purposes of deciding a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court does not, however, accept as true any legal conclusions within the Complaint.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

NMDGF disclosed data to a requester in an excel document but then produced the same information to Plaintiffs in a PDF file. *Id*. at ¶ 15.  Plaintiffs claim that the PDF format is "unusable and onerous" and that Defendants purposefully utilized that file type to further retaliate against them. *Id*.  Lastly, Plaintiffs allege that Defendants destroyed records that contained the names of "other individuals who had requested and received" IPRA disclosures from the NMDGF in 2016. *Id*. at ¶ 17.

## II.   PARTIES' ARGUMENTS

Defendants first argue that Plaintiffs' First Amendment retaliation claim "is simply unsupported by any legal precedent and is basically groundless."  Mot. at 4.  Defendants contend that *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) is dispositive of whether Plaintiffs state a plausible First Amendment retaliation claim.  *Id*.  According to Defendants, *Trudeau* commands dismissal of Count I because the disseminated email at issue contains no false or misleading information. *Id.* at 4–6.  Alternatively, Defendants argue that public officials can express critical views of members of the public even when those views are false and, therefore, Defendants have not "come even close to crossing the line into protected speech." *Id*. at 8 (citing *Brenner v. Bd. of Cty. Comm'r (Councilors) for Cty. of Los Alamos*, No. CV 18-478 KG/KBM, 2019 WL 1060812, at *1 (D.N.M. Mar. 6, 2019)).

Plaintiffs respond that, even though some or all of the individual statements contained in the email may be true, the press release nonetheless was "false and misleading as a whole . . . and it was intended to portray a false account of the [NMDGF's] release of the [hunters'] information." Resp. at 5.  Plaintiffs argue that the NMDGF intentionally misled the reader by omitting that, prior to the underlying IPRA lawsuits, it had already disclosed identifying information about New Mexico hunters in response to other unrelated IPRA requests.  *Id*.  And the NMDGF complied

with these requests without the need for the requester to file an IPRA action in state court.  *Id*. Plaintiffs further assert that Defendants intentionally omitted from the email that the NMDGF was also disclosing applicant information in response to other unrelated IPRA requests contemporaneously with the court ordered releases to Plaintiffs.  *Id*. at 5–6.  With regard *Trudeau* and *Brenner,* Plaintiffs contend that Defendants' reliance is misguided because the cases are non-binding and distinguishable.  *Id*. at 4–5.

Finally, while the briefing focuses exclusively on the March 19, 2020, email, Plaintiffs make several additional accusations of retaliation that the Court will address, which include that the NMDGF provided IPRA disclosures in PDF format and destroyed records of other IPRA requests.  *See* FAC at ¶¶ 15, 17.

## III.   LEGAL STANDARD

A Rule 12(b)(6) motion "tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). In doing so, courts must "accept as true all well-pleaded factual allegations in a complaint and view [those] allegations in the light most favorable to the [non-moving party]." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The allegations must "state a claim to relief that is plausible on its face." *Id.* (quoting *Ridge at Red Hawk L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)). "The claim is plausible only if it contains sufficient factual allegations to allow the court to reasonably infer liability." *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018) (citing *Iqbal*, 556 U.S. 662, 678 (2009)). The term "plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

4

556 (2007)). The factual allegations must "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555—i.e., "that discovery will reveal evidence to support the plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). A mere "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## IV.   ANALYSIS

### A. March 19, 2020, Email

At bottom, Defendants argue that the Court should dismiss Count I because the email was not false or misleading.  The Court agrees.

In the Tenth Circuit, First Amendment claims against non-employer defendants require:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (internal quotations omitted) (citation omitted).  Here, Defendants contend only that the FAC fails to state a claim because the email is not misleading, i.e., that there is no actionable retaliatory conduct under *Worrell*.  Essentially, Defendants argue that, before the *Worrell* elements apply, the Court must first find that the email is false or misleading.  This raises the issue of whether, as Plaintiffs argue, the Court can determine as a matter of law on a 12(b)(6) motion that the email is not false or misleading.  It also requires the Court to determine whether a public official's speech can be actionable retaliatory conduct even if it is truthful.  The Court will answer each in turn.

1. *The Truth or Falsity of a Statement can be Decided as a Matter of Law*

Plaintiffs contend that the determination of whether the email is false or misleading is a fact-based inquiry reserved for the jury, thus the Court cannot grant Defendants' Motion.  Resp. at 4.  The Court disagrees.  "In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference."  *Smith*, 561 F.3d at 1098 (internal citations omitted).  The documents must be "central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id*. (quoting *Alvarado v. KOB–TV, L.L.C*., 493 F.3d 1210, 1215 (10th Cir. 2007)).  Courts may also determine on a Rule 12(b)(6) motion whether disseminated information is misleading or false as a matter of law.  *See, e.g., Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 855 (10th Cir. 1999) (explaining that courts may review a complaint for false assertion of fact "by considering . . . whether a reasonable factfinder could conclude that [the disseminated information] implied a false assertion of fact"); *see also Trudeau*, 456 F.3d at 193 ("We do not agree that the truth or falsity of a statement can never be decided as a matter of law.").

Accordingly, because of the email's centrality to Plaintiffs' claim, the Court will consider it alongside the FAC to determine whether, in the light most favorable to Plaintiffs, the allegations in the FAC plausibly establish that the email is false or misleading.  *See, e.g., Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1137 (10th Cir. 2014) (applying "substantial truth" standard to determine whether factual allegations were sufficient to state a plausible defamation claim).

2. *The Email is not False or Misleading*

At the outset, the Court notes that the parties' briefing lacks citation of binding authority on the issue of whether a truthful press release can be considered retaliatory conduct.[3]   Defendants proffer two cases to support their Motion, *Trudeau* and *Brenner*.  Defendants first rely on *Trudeau* for the proposition that the email was not false or misleading as a matter of law.

In *Trudeau,* the plaintiff marketed two products as cure-alls in nationally televised information-commercials ("informercials").  456 F.3d at 180.  The Federal Trade Commission ("FTC") filed an action in federal district court alleging that the marketing was false and misleading.  *Id*.  To resolve the dispute, "the parties agreed to, and the court entered, a Stipulated Final Order for Permanent Injunction and Final Judgment [] that resolved all pending FTC complaints against [the plaintiff]."  *Id*. at 180–181.  Five days after the court's order, the "FTC posted on its website a press release entitled 'Kevin Trudeau Banned from Infomercials,' and subtitled 'Trudeau Settles Claims in Connection with Coral Calcium Supreme and Biotape.'"  *Id.* at 181.  Among other things, the plaintiff alleged that the press release was false and misleading and, therefore, a violation of the First Amendment.   The FTC moved to dismiss the plaintiff's complaint and the district court granted that motion.

---

[3] The Tenth Circuit is not completely silent on whether a press releases can violate the First Amendment under Plaintiffs' theory of liability.  Recently, it addressed a First Amendment retaliation claim that resulted from an alleged unlawful arrest and press release.  *See Hinkle v. Beckham Cty. Bd. of Cty. Comm'r*, 962 F.3d 1204 (10th Cir. 2020). There, the court only addressed the press release under the third *Worrell* element, whether the "adverse action was substantially motivated as a response to the exercise of constitutionally protected conduct," because the defendant had conceded the first two elements for summary judgment purposes.  *Id*. at 1227.  In considering the surrounding circumstances, the court found an absence of retaliation because "the press release followed an arrest that *was* based on probable cause" and "merely reported the details of that lawful arrest."  *Id*. at 1228 (emphasis in original).  The court noted that the case was "not one in which a *false* Press Release follows immediately on the heels [of] an arrest *without* probable cause.  *Id*. (internal quotation omitted) (first emphasis in original).  In sum, the court found no causal connection between the plaintiff's protected conduct and the press release.  *Id*.  While instructive, the issue before this Court is whether a *truthful* press release can even be considered retaliatory conduct, i.e., whether the second *Worrell* element is met.  Implicit in *Hinkle*'s holding, however, is that a truthful summary of events that follows lawful activity cannot be considered retaliatory.

On appeal, the D.C. Circuit first rejected the plaintiff's argument that the truth or falsity of a statement can never be decided as a matter of law. *Id*. at 193. In doing so, the court concluded that an "essential element" of the plaintiff's First Amendment retaliation claim "is the contention that the [disseminated] press release is false or misleading." *Id*. at 192. Therefore, the court adopted a "no reasonable juror" standard to determine whether statements made in the FTC press release were false or misleading. *Id*. at 194. The court then addressed and rejected in turn the plaintiff's assertions that

> the FTC's press release falsely and misleadingly characterizes the 2004 Final Order in four respects: it [1] falsely stat[es] that Trudeau had been banned entirely from infomercials, [2] erroneously impl [ies] that the settlement was a judicial finding that Trudeau was a habitual false advertiser, [3] falsely impl[ies] that the $2 million was a fine, and [4] conspicuously omit[s] the fact that there has been no finding of false advertising.

*Id*. (brackets in original) (internal quotation marks omitted).

The court concluded that the plaintiff's first assertion lacked merit because the press release explicitly noted that the ban did not apply to truthful infomercials or informational publications. *Id*. at 195. The court likewise determined that the plaintiff's second contention was erroneous because "[b]y [the FTC's] use of quotation marks, the paragraph makes clear that the statement is that of Acting Director Parnes—not that of the district court." *Id*. at 196. Similarly, the court rejected the plaintiff's third contention that the press release inaccurately characterized the $2 million payment because: (1) "the $2 million fund is in fact part of a 'judgment' against him, as the 2004 Final Order expressly states;" (2) "the news release nowhere, overtly or otherwise, characterizes the $2 million as a 'fine;'" and (3) "the press release makes clear, repeatedly, that the fund was part of a voluntary settlement agreement." *Id*. at 196. Finally, when addressing the contention that the press release omitted that there had been no findings of liability, the court held that "a reasonable reader" could not "construe the press release as suggesting that there had been

8

such a finding" because the online version of the press release "contain[ed] a link to the [court order], prominently displayed in bold at the top-right corner of the webpage." *Id*. The court concluded that "no reasonable person could misinterpret the press release in the ways that [the plaintiff] suggests. Accordingly, [the plaintiff's] complaint [was] legally insufficient to state a claim." *Id*. at 197.

Defendants also argue that *Brenner*, a case from within this District, further supports dismissing Plaintiffs' First Amendment claim. In *Brenner*, the plaintiffs opposed the issuance of a Los Alamos County recreation bond. 2019 WL 1060812, at *1. They formed a political action committee ("PAC") to oppose the bond, while those in favor, notably the defendants who were Los Alamos County Council members, formed a PAC in support of the bond. *Id*. To further oppose the bond, Mr. Brenner sent a "strongly worded" email to the Los Alamos County Council informing them "that he would work zealously to defeat the Rec Bond." *Id*. Within hours of the email being sent, the "Los Alamos Daily Post (LADP) published [Mr. Brenner's] email in its online newspaper and on its Facebook page." *Id*. The publication resulted in "'hostile and threatening letters to the editor' and 'derogatory, defamatory, hurtful, and negative comments'" directed towards the plaintiffs. *Id*. (citation omitted).

In support of their First Amendment claim, the plaintiffs argued that the same day release of the email to the Los Alamos Daily Post was a retaliatory action for their opposition to the bond. Specifically, they argued (1) that they "believed the email 'would remain private' under the City Charter, 'which prevents the disclosure of confidential information outside of compliance with the Inspection of Public Records Act,'" and (2) "had LADP or the public requested the email through an Inspection of Public Records Act (IPRA) request, it would have taken 'days or weeks' to process." *Id*. at *1–2.

The court rejected these arguments on several grounds.  First, the court held that the plaintiffs failed to state a claim because they "d[id] not allege any specific facts, other than a general reference to the City Charter and IPRA, to suggest that the May 15, 2017, email was 'confidential' and, thus, not subject to release to the LADP" on the day the email was originally sent.  *Id*. at *5.  The court noted that: (1) the plaintiffs opposition to the bond was already known to the public, (2) the email was not confidential under IPRA, (3) no law supported the assertion that documents can only be disclosed through IPRA requests, and (4) the complaint failed to allege facts to support the "conclusory" allegation that an IPRA request would take "days or weeks to process." *Id*.

Second, the court explained that "a public official's conduct 'is generally actionable only in situations of threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action w[ill] immediately follow.'"  *Id*. at *4 (quoting *Van Ert v. Blank*, No. 16-C-0770, 2018 WL 3235559, at *5 (W.D. Wis. July 2, 2018), citing *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016)).  "A plaintiff can show that she suffered an actionable deprivation by alleging that 'a public official . . . retaliated by subjecting [her] to embarrassment, humiliation, and emotional distress. But this is a high bar, usually limited to the release of 'highly personal and extremely humiliating details' to the public.'"  *Id*. (quoting *Van Ert,* 2018 WL 3235559, at *5).  With this guidance, the court found that it could not "reasonably infer that the release of the email to the LADP hours after Patrick Brenner sent it to the Los Alamos County Council rises to the level of a threat, coercion or intimidation to punish Plaintiffs, sanction Plaintiffs, or impose an adverse regulatory action against [the plaintiff's]." *Id*. at *5.  The court further explained that the complaint was devoid of any allegations that the "email contained 'highly personal and extremely humiliating details' sufficient to meet the high bar for retaliation."  *Id*.  Consequently, the court held that the plaintiffs failed to

allege that the release of the "email to the LAPD was a plausible act of retaliation in violation of the First Amendment." *Id*.

Plaintiffs cast *Trudeau* and *Brenner* as distinguishable and not controlling.  Resp. at 5. Plaintiffs argue that *Trudeau* is not binding on this Court and that, unlike here, "specific language in the [FTC's] press release rendered it objectively not misleading to a reasonable person." *Id*. Similarly, Plaintiffs argue that *Brenner* involved a personal communication published with retaliatory intent and not "allegations that a publication was misleading by omission." *Id*.   The Court disagrees with Plaintiffs.  The Court finds both *Trudeau* and *Brenner* persuasive and will apply their reasoning here.

Plaintiffs argue that the press release is false and misleading because it omitted that the NMDGF had previously disclosed the same information to others without the need for litigation and that the NMDGF "had [also] done so contemporaneous with the [court ordered] release." Resp. at 5–6.  Plaintiffs maintain that the press release created a false impression of both the court ordered IPRA disclosure and Plaintiffs' motivations for the corresponding requests. *Id*.  Plaintiffs also argue that the inclusion of the New Mexico Attorney General's contact information demonstrates that the press release was disseminated specifically to retaliate. *Id*.  These arguments are unpersuasive.

To begin, on its face the March 19, 2020, email press release is not false or misleading. The press release is entitled "Courts Order Department To Release Customer Names, Email, Addresses Today." FAC Ex. 3; Mot. Ex. A.  The first two paragraphs merely explain to the email's intended recipients that a New Mexico district court ordered the NMDGF to turn over information to Plaintiff Whitehead and that the New Mexico Court of Appeals ordered the NMDGF to turn over information to Plaintiff Dunn. *Id*.  The third paragraph accurately explains the reasoning

behind the two court decisions.  The fourth paragraph correctly details the events that led to the underlying IPRA lawsuits.  The fifth paragraph includes a statement from Defendant Sloane in his official capacity as Director of the NMDGF.  *Id*.  Finally, the press release concludes with the following:

> The Department will release the requested information today and wants to make their customers aware.  Individuals who believe they are being harassed by solicitors or similar as a result of this release should call toll-free (844) 255-9210 or file a complaint online at www.nmag.gov/file-a-complaint.aspx.

*Id*.

Nothing in the press release is misleading when viewed in light of Plaintiffs allegations.  It explicitly tells the recipients the purpose of the release.   It accurately describes a matter of public concern, i.e., that two New Mexico Courts ordered the NMDGF to release personal identifying information of over 300,000 hunting applicants.  The NMDGF limited the scope of the press release to only matters concerning the two underlying IPRA lawsuits and its impending compliance with the two court orders.  A reasonable reader would not be misled because the NMDGF failed to disclose in the press release that it had previously complied or does currently comply with other IPRA requests.  The inclusion of information about other IPRA disclosures would be irrelevant and only confuse the reader unless they were also court ordered or of the same magnitude and occurred during the same timeframe.  Similarly, the IPRA requests concerned the personal identifying information of over 300,000 applicants.  The NMDGF did not know why Plaintiffs requested the personal contact information of its applicants rather than just the names.  Indeed, concern over releasing this information to private individuals prompted the underlying litigation.  This Court will not find that the inclusion of a link to the New Mexico Attorney General's complaint line transforms a completely factual press release into actionable retaliatory

12

conduct.  And "no reasonable person could misinterpret the press release in the ways [Plaintiffs] suggest." *Trudeau*, 456 F.3d at 197.

Moreover, applying *Brenner*'s reasoning, which limits First Amendment retaliation claims against public officials to only situations of "threat, coercion or intimidation to punish" or where the speech subjects the plaintiff  "to embarrassment, humiliation, and emotional distress," Plaintiffs' FAC fails to plead plausible retaliatory conduct.  2019 WL 1060812, at *4 (quoting *Van Ert*, 2018 WL 3235559). Absent from the FAC are sufficient factual allegations that that the email plausibly threatened, coerced, or intimated Plaintiffs.  The inclusion of the Attorney General's contact information does not make it plausible that Defendants retaliated through intimidation or threats.  Indeed, the NMDGF informed the readers to utilize the complaint line only if they believed that they were "being harassed by solicitors or similar." FAC Ex. 3; Mot. Ex. A.  Lastly, Plaintiffs fail to allege that the email subjected them to embarrassment, humiliation, or emotional distress specifically caused by the release of "highly personal and extremely humiliating details to the public." *Brenner*, 2019 WL 1060812, at *4 (quoting *Van Ert*, 2018 WL 3235559).  The press release contained only factual and publicly available information.

3.  *Plaintiffs Do Not Allege Sufficient Factual Allegations Under a Traditional § 1983 Analysis*

But aside from concluding that, under *Trudeau* and *Brenner*, the press release cannot be used as the requisite adverse conduct under *Worrell*, the Plaintiffs fail to present sufficient factual allegations that would make a First Amendment retaliation claim plausible.  To illustrate, Plaintiffs allege that "Defendants" collectively disseminated the press release but then fail to identify which individual Defendant(s) personally participated in its creation and release, which is required for individual liable under 42 U.S.C. § 1983.  *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.

1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.").[4]  Furthermore, Plaintiffs do not assert that the NMDGF violated any law or policy by disseminating the press release.  Nor do Plaintiffs allege that, under the current administration (as opposed to the NMDGF's past practices under different leadership), Defendants have never issued a press release after being court ordered to comply with an IPRA request of similar size.

### 4.  Conclusion

When viewing the factual allegations in the FAC as true and in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to allege that the March 19, 2020, press release was a plausible act of retaliation in violation of the First Amendment.

### B.  Post-Press Release PDF Disclosure and Spoliation

Although the briefing exclusively focuses on the March 19, 2020, email, for the sake of thoroughness the Court will address two additional allegations that it identifies as part of Count I. Plaintiffs' additional allegations, however, do not have an added wrinkle of protected speech. Therefore, the three *Worrell* elements apply without that additional consideration.

Plaintiffs allege that Defendant Montoya "continued the retaliation by the NMDGF by providing the records [sought by Plaintiffs in a post-press release IPRA request] to [them] in [the] largely unusable and onerous file format of PDF."  FAC ¶ 15.  Unfortunately for Plaintiffs, this allegation, without more, fails to plausibly establish that Defendant Montoya's actions were adverse or "substantially motivated as response to [Plaintiffs'] exercise of constitutionally protected conduct."  *Worrell*, 219 F.3d at 1212.  For example, Plaintiffs fail to allege that IPRA or

---

[4] Plaintiffs do allege that "Defendant Montoya has in the analogous time frame . . . supplied the same records without Defendants Bickford and Sloane issuing a press release notifying the public that the records were being provided." FAC ¶ 13.  This allegation, however, does not speak to the March 19, 2020, press release and is therefore insufficient to identify which Defendant was personally involved in creating or disseminated the email.

any internal NMDGF policy required Defendant Montoya to provide information in an excel file rather than a PDF.  And while Plaintiffs do allege that Defendant Montoya provided the "same records" to other individuals in excel format, they fail to allege that Defendant Montoya had never previously provided any information in PDF format.  "[A] trivial or de minimis injury will not support a retaliatory prosecution claim."  *Id*. (quoting *Eaton v. Meneley*, 379 F.3d 949, 954–55 (10th Cir. 2004)).

Plaintiffs' last retaliation allegation stems from Plaintiff Dunn's underlying IPRA lawsuit. Plaintiffs allege that, "[i]n furtherance of this same retaliation NMDGF spoliated the evidence regarding other individuals who had requested and received the public records in 2016."  FAC ¶ 17.[5]  Again, this allegation fails because it does not identify which Defendant allegedly destroyed the relevant records as required by § 1983. *See Foote*, 118 F.3d 1416, 1423.  Additionally, Plaintiffs do not allege that any Defendant had notice that Plaintiffs would request this information and destroyed it, nonetheless.  Plaintiffs also do not allege that any Defendant violated IPRA, an internal NMDGF policy, or New Mexico law by destroying the records.  Simply put, this conclusory allegation does not make it plausible that Defendants retaliated against Plaintiffs for seeking redress in New Mexico state court.

### C.  First Amendment Retaliation under the New Mexico Constitution

New Mexico applies the interstitial approach to interpreting the state constitution.  *State v. Tapia*, 2018-NMSC-017, ¶ 39, 414 P.3d 332, 341 (citing *State v. Gomez*, 1997-NMSC-006, 122 N.M. 777, 932 P.2d 1).  Under this approach, New Mexico courts "may diverge from federal

---

[5] Plaintiffs attached two documents to the FAC in support of this allegation, which the Court will consider.  *See Smith*, 561 F.3d at 1098 ("courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference").  Upon review, however, it appears that Plaintiff Dunn requested the information he alleges was destroyed in March of 2020.  *See* FAC Ex. 10.  The NMDGF destroyed the records in March of 2018.  *See id*. Ex. 11.

precedent where the federal analysis is flawed, where there are structural differences between the state and federal governments, or because of distinctive New Mexico characteristics." *Id*. As stated above, this Court has concluded that Defendants did not violate Plaintiffs' First Amendment rights. Accordingly, unless Plaintiffs can direct the Court to New Mexico precedent that warrants divergence, the Court must dismiss Count I as brought under the New Mexico Constitution.

Defendants argue that "there is no meaningful basis to depart from the [federal] analysis." Mot. 8. Plaintiffs failed to respond to Defendants' argument on this point. Aside from Plaintiffs now waiving the ability to argue for a different outcome under state law,[6] this Court cannot find a New Mexico case contrary to the First Amendment analysis under the United States Constitution. Consequently, Count I cannot proceed under the New Mexico Constitution.

## V.   CONCLUSION

Plaintiffs have failed to state a plausible First Amendment retaliation claim against Defendants. Because the Court will dismiss the only federal claim in the FAC, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claim and will dismiss it as well. *See Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) ("if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (internal brackets and quotation marks omitted)).

---

[6] The Court's Local Rules provide that "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ 7.1(b). Implicit in that rule is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument. Furthermore, under Tenth Circuit law, failing to respond constitutes waiver. *See, e.g., Cole v. New Mexico*, 58 F. App'x 825, 829 (10th Cir. 2003) (unpublished) (argument waived when not raised in initial response to motion to dismiss); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (unpublished) (plaintiff abandoned claim when failed to respond to arguments made in support of summary judgment).

16

IT IS THEREFORE ORDERED THAT:

(1) Defendants' PARTIAL MOTION TO DISMISS AMENDED COMPLAINT (Doc. 3)

   is GRANTED;

(2) Count I of Plaintiffs' First Amended Complaint (Doc. 1-1) is DISMISSED;

(3) Count II of Plaintiffs' First Amendment Complaint is DISMISSED; and

(4) This case is REMANDED to the State of New Mexico, Torrance County, Seventh

   Judicial District Court for adjudication of Plaintiffs' state law claim.

_____

SENIOR UNITED STATES DISTRICT JUDGE